# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

─────────────────────────────────

United States of America,                           Criminal No: 05-249 (PAM/JJG)

                Plaintiff,

v.                                                  **REPORT &**
                                                    **RECOMMENDATION**

James T. Anderson (01),
Michelle "Mikki" Bedard-Anderson (02),
Neil Dolinsky (03),

                Defendants.

─────────────────────────────────

## APPEARANCES

John Docherty, Assistant United States Attorney, for Plaintiff

Mark Larsen and William Michael, Esqs., for Defendant James T. Anderson

Joseph Freidberg, Esq., for Defendant Michelle "Mikki" Bedard-Anderson

Kevin Short, Esq., for Defendant Neil Dolinsky

─────────────────────────────

JEANNE J. GRAHAM, United States Magistrate Judge.

The above-entitled matter came on for hearing before the undersigned Magistrate Judge of the

District Court on February 28, 2006, on the pretrial motions of The United States of America (the

"Government"), and each of the three defendants, James Anderson ("Anderson"), Michelle "Mikki"

Bedard-Anderson ("Bedard-Anderson") and Neil Dolinsky ("Dolinsky").  This matter is scheduled to be

tried before the Honorable Paul A. Magnuson, United States District Court for the District of Minnesota,

on May 10, 2006. The case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

## I.   INTRODUCTION

On August 2, 2005, a grand jury returned a thirty-count Indictment charging numerous violations relating to the allegedly illegal sales of Zomax, Inc. stock by the defendants. The First Count of the Indictment charges Anderson, Bedard-Anderson and Dolinsky with conspiracy in violation of 18 U.S.C. § 371 to commit securities fraud in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and to commit money laundering in violation of 18 U.S.C. § 1957. Counts Two through Seven charge Anderson and Bedard-Anderson with mail fraud and aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2, 1341 and 1346. Counts Eight through Twenty-Three charge Anderson and Bedard-Anderson with securities fraud and aiding and abetting securities fraud in violation of 15 U.S.C. § 78j, 18 U.S.C. § 2 and 17 C.F.R § 240.10b-5. Count Twenty-Four charges Anderson and Dolinsky with securities fraud and aiding and abetting securities fraud in violation of 15 U.S.C. § 78j, 18 U.S.C. § 2 and 17 C.F.R § 240.10b-5. Counts Twenty-Five through Thirty charge Anderson and Anderson-Bedard with money laundering and aiding and abetting money laundering in violation of 15 U.S.C. § 78j, 18 U.S.C. §§ 2 and 1957 and 17 C.F.R § 240.10b-5. The Indictment also includes forfeiture allegations against Anderson, Bedard-Anderson and Dolinsky.

This Court held a pretrial motions hearing on February 28, 2006, at which Anderson, Bedard-Anderson and Dolinsky were present and represented by counsel. Each of the defendants and the Government filed pretrial motions. There were no testifying witnesses at the hearing, and no exhibits were entered. The Court has previously addressed the parties' non-dispositive motions in a separate Order

dated March 1, 2006.  The Court now addresses defendants' dispositive motions in this Report and Recommendation.

## II.    FACTUAL BACKGROUND

The Court first summarizes the factual allegations contained in the Indictment.  Zomax, Inc. ("Zomax") was, at all relevant times, a Minnesota corporation engaged primarily in the business of manufacturing and selling magnetic recording/storage media such as compact disks and DVDs.  Zomax's common stock was listed upon, and traded through, the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), a national securities exchange.  In addition to its Minnesota headquarters, Zomax had manufacturing facilities in California, Ireland and Canada, and customer service centers in Indiana and Ireland.

Anderson was, at all relevant times, the Chairman and Chief Executive Officer of Zomax.  As Chairman and Chief, Anderson had routine and ready access to material, non-public information concerning Zomax.  Bedard-Anderson, at all times relevant, was married to Anderson, was Vice President of Sales at Zomax and had routine and ready access to material, non-public information concerning Zomax.  Dolinski, at all times relevant, was a friend of Anderson, an experienced investment manager and an owner of Zomax stock for the purposes of personal investment.

The Indictment alleges that from about June 2000 through about November 2000, Anderson, Bedard-Anderson and Dolinsky participated in a scheme to defraud Zomax and its shareholders by trading in Zomax's common stock on the basis of their advanced knowledge of material, non-public inside information.  The defendants did so in the expectation of avoiding financial loss to themselves due to an anticipated drop in the value of Zomax common stock when the company publically reported worse-than-

anticipated third quarter sales figures.

Each year Zomax prepared a financial forecast for the upcoming year, and each month senior Zomax management, including Anderson and Bedard-Anderson, received a confidential financial report setting forth how the company had performed the preceding month and comparing those results to the goals set forth in the full year forecast. Zomax publically announced its financial results shortly after the end of each financial quarter in a press release and a telephone conference call with investment firm analysts and the financial press that was hosted by Zomax senior management.

It was the express, written policy of Zomax that its employees were not to trade in the securities markets on the basis of any confidential information those employees had garnered by virtue of their employment at Zomax. It was also the policy of Zomax that its employees would not trade in the company's stock at all during the last month of a financial quarter. The month of September 2000 was the last month of Zomax's third quarter of 2000. According to the company's 2000 full year forecast, the third quarter anticipated sales forecast was $74,929,000.

On or about June 20, 2000, Dolinsky sent Anderson an email in which he asked whether Anderson, if asked by someone close to him, would recommend against the purchase of Zomax stock to a close friend or family member. In a June 21, 2000, reply Anderson stated he would not advise the purchase of Zomax stock, although he was not sure if he would actually advise against such a purchase.

On or about July 17, 2000, the Chief Financial Officer at Zomax distributed a report to senior management, including Anderson and Bedard-Anderson. This report indicated Zomax's projected third quarter revenues would be approximately $14,405,000 below the full year forecast's third quarter figure of approximately $75 million. However, during a July 24, 2000, conference call with financial analysts

regarding Zomax's second quarter results, in which several senior Zomax managers including Anderson participated, Anderson responded to a question that he anticipated growth of approximately twenty percent during the third and fourth quarters of 2000.  Zomax made no further public announcements regarding its financial prospects for the third quarter until September 21, 2000.

On or about August 3, 2000, Zomax senior managers received the monthly financial report regarding the company's performance in July 2000.  The report indicated that sales for July had fallen short of the July sales projections in the full year forecast by $1,988,870, or approximately ten percent.  The report also forecasted that for the third quarter as a whole, Zomax revenues would fall approximately $15 million short of the full year forecast's projections of approximately $75 million.        Zomax senior managers again received a monthly financial report in late August or early September that informed them of the Company's financial performance in August 2000.  The report indicated sales for August had fallen short of the full year forecast by approximately $730,000, and forecasted that third quarter sales would fall approximately $18 million short of the full year forecast figure of approximately $75 million.

Anderson and Bedard-Anderson are alleged to have sold 356,000 shares of Zomax stock through their joint brokerage account at Charles Schwab & Co., Inc. through twenty-seven separate, open market sales transactions executed between August 4 and August 24, 2000, for a total of approximately $5.7 million.  The Indictment further alleges that Anderson and Bedard-Anderson formed the "Jim and Mikki Anderson Charitable Remainder Trust" on or about August 18, 2000, into which they transferred approximately 465,000 shares of Zomax stock on or about September 1, 2000.  The Trust account was established at Schwab and all of the approximately 465,000 shares of Zomax stock were sold, in twenty-seven separate open market transactions during the time period of September 18 through September 20,

2000. The stock sale transactions from the Trust totaled approximately $8.4 million. Dolinsky sold 11,000 shares of Zomax stock on September 8, 2000.

The Indictment alleges that Anderson exerted influence and control over the securities trading activities of the Trust's trustee, and that Anderson telephoned the trustee with near-daily frequency between September 6 and 20, 2000, to inquire about the trustee's sale of Zomax stock, to educate the trustee about methods by which such a large amount of stock could be sold without affecting the price of the stock, and to encourage the trustee to continue to aggressively sell the stock. The last shares of Zomax stock were sold by the trustee on September 20, 2000, when the market price of the stock was $16.68 and three-quarters per share.

Zomax stock closed at $17.38 per share on September 21, 2000. On that same day, after the market closed, Zomax issued a press release stating that "its third quarter 2000 financial results would be lower than current consensus estimates," and that the third quarter revenues would be between $57 million and $59 million, rather than the consensus estimates (of the financial community) of approximately $70 to $75 million. The price of Zomax stock fell to $8.31 per share at the close of the market on Friday, September 22, 2000, and then to $6.84 per share at the close of the market on Monday, September 25, 2000.

As a result of this alleged conduct, Anderson, Bedard-Anderson and Dolinsky were charged in the thirty-count Indictment described above.

## III.    DISCUSSION

### A.    Anderson's Motion to Dismiss Count 1 for Duplicity

Defendant Anderson moves for the dismissal of Count One of the Indictment on the grounds that

6

it charges two separate conspiracies and is, therefore, duplicitous.  Specifically, Anderson argues that Count One alleges a conspiracy involving himself and his wife, Bedard-Anderson, and a separate and distinct conspiracy involving himself and Dolinsky.  Anderson argues the imprecise charges and accusations in Count One of the Indictment violate his Fifth Amendment right to notice and his Sixth Amendment rights to unanimity and grand jury indictment.  The Court previously granted Bedard-Anderson and Dolinsky permission to join in Anderson's motion.

An indictment is duplicitous if it joins in a single count two or more distinct and separate offenses. United States v. Street, 66 F.3d 969, 974 (8th Cir.1995) (citing Gerberding v. United States, 471 F.2d 55, 59 (8th Cir.1973)).  "The principal vice of a duplicitous indictment is that the jury may convict a defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." Id. (quoting United States v. Karam, 37 F.3d 1280, 1286 (8th Cir.1994)).

To determine whether a given case involves a single or multiple conspiracies requires the Court to determine "whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." United States v. Radtke, 415 F.3rd 826, 838 (8th Cir.2005) (quoting United States v. Massa, 740 F.2d 629, 636 (8th Cir.1984).  Anderson contends that the Indictment fails to identify the existence of a single overall plan.  Anderson argues that Count One alleges he and Bedard-Anderson engaged in a course of conduct to engage in various stock trades based upon inside material, non-public information, while also alleging that he and Dolinsky engaged in distinct and separate efforts to determine whether Anderson believed Dolinsky should buy Zomax stock.  The Court disagrees.

Determination of whether there is one overall agreement establishing a conspiracy involves the consideration of such relevant factors as "the nature of the activities involved, the location where the alleged

events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which

the acts occurred."  Radtke, 415 F.3rd at 839-40 (quoting United States v. McCarthy, 97 F.3d 1562,

1571 (8th Cir.1996)).[1]  Importantly, "a conspirator need not know all of the other conspirators or be aware

of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to

furtherance of the conspiracy."  Messa, 740 F.2d at 636.

Here, the evidence supports a finding of a single conspiracy involving Anderson, Bedard-Anderson

and Dolinsky to sell Zomax stock on the basis of material, non-public information for their own enrichment.

First, Count One alleges that Zomax executives Anderson and Bedard-Anderson possessed material, non-

public information regarding the likelihood of a coming decline in the value of Zomax stock, and that

Anderson, the highest ranking executive at Zomax, shared that information with Dolinsky, an experienced

investment manager and friend of Anderson, as well as an owner of Zomax stock.  Second, the Indictment

alleges that all of the Zomax stock trades identified in the Indictment were initiated on the basis of the

material, non-public information shared between Anderson, Bedard-Anderson and Dolinsky, and that all

of the trade transactions occurred in the state of Minnesota.  In addition, the Indictment alleges all of the

stock trades by Anderson, Bedard-Anderson or Dolinsky identified in the Indictment occurred within the

---

[1] Anderson devotes a significant portion of his brief to Kotteakos v. United States, 328 U.S. 750 (1946) which applies a "wheel/spokes/rim" test when considering the presence of more than one conspiracy.  The Eighth Circuit has routinely applied the Radtke factors to the determination of a whether there is a single or multiple conspiracies in a particular case.  Absent a showing from Anderson of use of the Kotteakos test by the Eighth Circuit in this context, this Court declines the invitation to deviate from the Circuit's precedent.

two months immediately preceding Zomax's public announcement of disappointing third-quarter financial results, after which the price of Zomax shares sharply declined.  Under the Radtke factors, the Court finds that Count One of the Indictment sufficiently alleges that Anderson, Bedard-Anderson and Dolinsky joined in a single scheme to defraud Zomax, its shareholders and the investing public by selling Zomax stock on the basis of material, non-public information to avoid significant financial losses, and that each engaged in specific conduct in furtherance of the scheme.

Anderson further asserts that Bedard-Anderson and Dolinsky were unaware of each others' activities regarding ownership of Zomax stock.  Anderson also argues that Bedard-Anderson did not know Dolinsky owned Zomax stock, and that Dolinsky had no knowledge of the creation or use of a Trust by Anderson and Bedard-Anderson to sell Zomax stock.  Anderson contends this lack of connection and understanding between Bedard-Anderson and Dolinsky indicates the absence of a single conspiracy between all three defendants.  Anderson claims the alleged criminal conduct by and between Anderson and Bedard-Anderson occurred distinctly and separately from the alleged criminal conduct by and between Anderson and Dolinsky, and that Anderson's membership in each group cannot be the basis for finding the existence of a single conspiracy instead of two separate conspiracies.

The Court finds these argument unavailing.  The existence of multiple groups of individuals does not preclude the possibility of there being one overall conspiracy.  U.S. v. Roark, 924 F.2d 1426, 1429 (8th Cir.1991).  It is true that a single conspiracy is not proven by a mere overlap of personnel or knowledge of another's illegal conduct.  U.S. v. Peyro, 786 F.2d 826, 829 (8th Cir.1986).  To prove that individual agreements among separate conspirators were made to advance a single enterprise, the government must demonstrate that the conspirators each were motivated by a common purpose.  Id.  It is

also true that "[a] single conspiracy may exist even if many participants are unaware of, or uninvolved in, some of the transactions." <u>United States v. Burns</u>, 276 F.3d 439, 444 (8th Cir.2002)(quoting <u>United States v. Roach</u>, 164 F.3d 403, 412 (8th Cir.1998), <u>cert. denied</u> sub nom, <u>Eagle Tail v. United States</u>, 528 U.S. 845 (1999).

As stated above, Count One of the Indictment sufficiently alleges that the defendants all joined in a single scheme to defraud Zomax, its shareholders and the investing public by selling Zomax stock on the basis of material, non-public information to avoid significant financial losses.

The allegations of Count One sufficiently demonstrate that Anderson's, Bedard-Anderson's and Dolinsky's trading in Zomax stock was motivated by a shared and common purpose–to avoid significant personal financial losses expected to occur when material, non-public information about Zomax's lower-than-expected third quarter financial results were made public. The Court finds the allegations in Count One set forth charges of a single conspiracy involving Anderson, Bedard-Anderson and Dolinsky, and that Count One is not duplicitous.

Anderson's motion to dismiss also challenges the manner in which the Government alleges overt acts in the Indictment. Specifically, Anderson contends several of the overt acts paragraphs articulated in Count One do not specify single acts, but are instead single paragraphs that allege multiple events and/or multiple defendants without any particularity. Anderson further contends that because of the charging of multiple overt acts in single paragraphs in Count One, the jury will face impermissibly excessive difficulties in attempting to complete a lengthy and cumbersome special verdict form when determining whether any one overt act has been committed by one specific conspirator. Anderson also claims the standard procedure of providing a unanimity instruction will not cure the duplicitous allegations in the Indictment.

10

Anderson therefore seeks dismissal of the Indictment or the striking of Count One.

There appears to be little law on the subject as it relates to multiple events contained within a single overt act allegation. However, the Court finds cases addressing the general principles of charging the offense of conspiracy helpful to its analysis.

An indictment is sufficient if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy. Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. White, 241 F.3d 1015, 1021 (8th Cir.2001). It is well settled that an indictment for conspiring to commit an offense–in which the conspiracy is the gist of the crime–may be less technically precise than an indictment for the substantive offense. United States v. Starr, 584 F.2d 235, 237 (8th Cir.1978)(citing Wong Tai v. United States, 273 U.S. 77, 81 (1927)). The Supreme Court has stated that "the particularity of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of a conspiracy [] is not essential to an indictment." See Glasser v. United States, 315 U.S. 60, 66 (1942)(citations omitted); Joyce v. United States, 153 F.2d 364, 366 (8th Cir.1946) (stating the alleged objects, motives, purposes and acts, including thirteen overt acts, of the conspirators are not part of the conspiracy charge itself, and serve only to advise the defendants of the scope of the government's evidence and to limit the inquiry at the trial)(citing Glasser, 315 U.S. at 66). Indeed, the Government need only show that one of the conspirators engaged in one overt act in furtherance of the conspiracy, and the act itself need not be criminal in nature. United States v. Hermes, 847 F.2d 493, 495-496 (8th Cir.1988). Moreover, in the prosecution of a charge of conspiracy, the government is not limited to proof of the overt acts charged in the indictment. See United States v. Coleman, 349 F.3d 1077, 1088 (8th Cir.,2003) (citing United States v. Dolan, 120 F.3d 856, 866 (8th

Cir.1997). The Court concludes that any specific requirements for the pleading of overt act allegations in a conspiracy charge would not exceed the well-defined parameters for pleading the conspiracy charge itself, and utilizes these parameters in its analysis of the sufficiency of the overt act allegations challenged here. Cf., United States v. McGuiness, 764 F.Supp. 888, 893 (S.D.N.Y.1991) (multiple acts within overt act allegations are proper for same reasons multiple acts can be aggregated in individual counts).

An "overt act" is an act of one or more of the conspirators to effect the object of the conspiracy." United States v. Hutchinson, 488 F.2d 484, 490 (8th Cir.1973). "The function of the overt act in a conspiracy prosecution is simply to manifest that the conspiracy is at work ... and is neither a project still resting solely in the minds of conspirators nor a fully completed operation no longer in existence." Yates v. Unites States, 354 U.S. 298, 334 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978). Accordingly, the overt act allegations in the Indictment in this case need only contain enough specificity of the time, place and circumstances of the alleged acts to advise the defendants charged with conspiracy of the evidence the Government intends to present to demonstrate an act was committed by at least one member of the conspiracy in furtherance of the conspiracy.

The allegations of overt acts committed in furtherance of the conspiracy are set forth in Paragraph 10 of the Indictment. Anderson challenges several of the subparagraphs.

Paragraph 10.b states:

> Between on or about August 4, 2000 and August 24, 2000, through their Schwab joint brokerage account, ANDERSON and BEDARD-ANDERSON consummated twenty-seven distinct, open-market transactions in which they sold a total of 365,000 shares of Zomax stock.

Paragraph 10.e. states:

ANDERSON telephoned the trustee of the Trust with near-daily frequency between September 6 and September 20, 2000, to inquire about the trustee's sale of Zomax stock, to educate the trustee about the methods by which such large amounts of stock could be sold without affecting the price of the stock, and to encourage the trustee to continue to aggressively sell Zomax stock.

Paragraph 10.f. states:

Between September 6 and September 20, 2000, the trustee of the Trust executed, at ANDERSON'S instigation, twenty-seven distinct, open-market transactions in which the Trust sold all 465,000 shares of Zomax stock.

Paragraph 10.i. states:

Between on or about September 14, 2000 and November 2, 2000, ANDERSON and BEDARD-ANDERSON engaged in six monetary transactions by, through or to a financial institution, affecting interstate commerce or foreign commerce, in criminally derived property of a value greater than $10,000, specifically, a payment by check of $20,000 to Pinetree Builders on or about September 14, 2000; a payment by check of $850,000 to the Treasury of the United States on or about September 14, 2000; a payment by check of $30,000 to Pinetree Builders on or about October 4, 2000; a payment by check of $15,000 to U.S. Bank on or about October 11, 2000; a payment by check of $150,000 to L.P. Ship Performance on or about October 14, 2000; and a payment by wire transfer of $1,775,000 to River Valley Abstract Title on or about November 2, 2000.

From the details that are provided in the overt act allegations set forth above, it is plain to the Court that paragraphs 10.b., 10.e, 10.f, and 10.i. each describe a series of acts that together comprise a specific continuing course of conduct committed by one or more of the conspirators in furtherance of the conspiracy. For example, 10.b.'s twenty-seven stock trades allegedly executed from the Schwab account, while not individually described in detail, are described as occurring within a specifically defined period of time, and as involving the same two defendants, the same brokerage account, and the same company's stock. This level of specificity provides ample opportunity for the defendants to be advised of the nature of each alleged overt act comprising the alleged series of acts, and to gain sufficient understanding as to the

evidence the Government possesses regarding the alleged furtherance of the conspiracy through the individual acts.

The same analysis applies to 10.e, 10.f. and 10.i.  The "near-daily" telephone calls alleged in 10.e. are specifically described as occurring within a defined period of time, and with Anderson placing each telephone call to the trustee of the Trust for the purpose of discussing an aspect of trading in Zomax shares held by the Trust.  The twenty-seven stock trades executed by the trustee alleged in 10.f. are described as similar in detail and thus connected to a continuing series of similar acts committed in furtherance of the conspiracy.  Paragraph 10.i. specifically sets forth the details of each of the six monetary transactions alleged therein, again describing a continuing series of acts by the same defendants during a specified period of time.  The Court concludes that this level of specificity in the Indictment's overt act allegations is more than sufficient to meet the pleading requirements set forth in the case law regarding the proper pleading of a conspiracy charge, and finds the overt act allegations in the Indictment to be properly pleaded.

The Court further finds that a jury will be capable of gaining a sufficient understanding of what overt acts the grand jury has charged in the Indictment from the overt act allegations as well as from the specific stock transactions and monetary transactions delineated in the substantive offense counts in the Indictment, which incorporate the conspiracy allegations by reference.

In addition, any risk of a non-unanimous jury verdict inherent in a duplicitous count in this Indictment could be cured by a limiting instruction that requires the jury to unanimously find a defendant guilty with respect to at least one distinct act. <u>Karam</u>, 37 F.3d at 1286.  The Court finds no reason to conclude that such an instruction would not protect Anderson's right to a unanimous verdict, or that  a jury would be unable to fully comprehend and apply such an instruction.

For all of these reasons, the Court recommends Anderson's Motion to Dismiss Count 1 for Duplicity, joined by Bedard-Anderson and Dolinsky, be denied.  However, while the Court finds that the overt act allegations in Count One are sufficiently pleaded, the provision of a bill of particulars by the Government could further assist the defendants' in raising a double jeopardy challenge in the future.[2]  This

---

[2] In its Order dated April 1, 2006, this Court denied Anderson's Motion for a Bill of Particulars, joined by Bedard-Anderson and Dolinsky, finding the Indictment sufficiently informs the defendant of the nature of the charges against him.  In making that determination, the undersigned stated:

> First, the Indictment's charging language regarding aiding and abetting is presented in a typical and familiar manner.  The Indictment specifically informs the defendants that they are charged with aiding and abetting each other, and sets forth the offenses charged in the words of the charging statutes.  The Indictment also includes a listing of each individual stock transactions at issue in this case setting forth the date and dollar amount of each transaction as well as the number of stock shares that are the subject of each transaction.  The Indictment further includes the identity of the sender of the information for those transactions included in the mail fraud charges.  The Court finds the indictment sufficient in its notification to defendants of the charges against them, and finds nothing unusual in the manner in which the defendants are charged with aiding and abetting each other.  See Johnson, 225, F.Supp.2d at 992 (citing United States v. Helmel, 769 F.2d 1306, 1322 (8th Cir.1985) ("it is generally sufficient that an indictment set forth the offenses in the words of the statute itself ... as long as the elements of the offense are delineated and the general statement is accompanied by the specific facts constituting the offense")).

See Order Dated April 1, 2006, at 5.

The Court's recommendation that a bill of particulars be provided in the instant order is made in the context the principles of double jeopardy.  While the Court finds the Indictment and the overt act allegations within it to be sufficiently pleaded to provide the defendants with constitutionally required notice and double jeopardy protections, Court believes that a bill of particulars, as specified above, will serve to provide the defendants with additional protections against double jeopardy issues that might arise in the future, and collaterally assist defendants in their preparation for trial.

The Government has indicated that the specific information to be required in the bill of particulars has already been disclosed in the "open file " discovery underway in this case.  Therefore, no undue burden will placed upon the Government in preparing the bill of particulars described herein, and the added protections to the defendants outweigh any slight burden that might exist.

15

determination is based upon the discrepancies in the Indictment between the reference to twenty-seven stock transactions in the overt act allegations set forth in 10.b. and 10.f. and the number of stock trades specifically identified in the substantive counts of mail fraud (Counts 2-7) and securities fraud (Counts 8-23). To obtain greater clarity regarding the additional trades referenced in the overt act allegations, which will assist the defendants in their trial preparation in this case as well as in future double jeopardy challenges, the Court recommends the Government be ordered to provide the defendants with a bill of particulars that identifies with specificity each of the twenty-seven stock trades referenced in Paragraph 10.b., and each of the twenty-seven stock trades referenced in Paragraph 10.f. For completeness, the bill of particulars should also include the identification of the date, time, caller and recipient, if known, for each of the telephone calls referenced in Paragraph 10.i.

### B.     Motion to Sever for Misjoinder of Defendants

In a motion offering arguments that overlap with those presented in Anderson's motion just discussed, Defendant Dolinsky moves to sever the charges alleged against him in the indictment (those alleging a conspiracy in Count One and the securities fraud charge in Count Twenty-Four) for misjoinder pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure. In the alternative, Dolinsky argues for permissive severance under Rule 14(a). The Court previously granted Anderson and Bedard-Anderson permission to join in Dolinsky's motion.

When a defendant moves for a severance, the court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. U.S. v. Darden, 70 F.3d 1507, 1526 (8th Cir.1995). If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14. Id. These rules are to be "liberally construed in favor of joinder." Id.

1.     Misjoinder under Rule 8(b)

Federal Rule of Criminal Procedure 8(b) states:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Pursuant to Rule 8(b), Dolinsky claims he has been inappropriately joined in the Indictment in this case. Dolinsky argues that the Indictment's allegations of criminal conduct by Dolinsky do not arise from the same act or transaction or series of acts or transactions specified in the Indictment against Anderson and Bedard-Anderson.  Like Anderson, Dolinsky argues that Count One of the Indictment does not allege a single conspiracy, but instead charges two separate conspiracies–one between Dolinsky and Anderson and another between Anderson and Bedard-Anderson.   Dolinsky contends the alleged Anderson/Dolinsky conspiracy and the related substantive charges should be severed from this case.

Under Rule 8(b), multiple defendants may be joined in the same indictment if "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  See United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir.1996) (citing Darden, 70 F.3d at 1526-27 (joined defendants and counts were factually interrelated)).  "Rule 8(b) has been interpreted to require some common activity involving all the charged offenses, but it is not necessary that every defendant have participated in or be charged with each offense." United States v. Connell, 841, F.2d 1408, 1431 (8th Cir. 1988).  "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993).  As a result, the prerequisites

for joinder of defendants under Rule 8(b) are to be liberally construed. Connell, 841, F.2d at 1432.[3]  If, on the other hand, a court determines that joinder is improper under Rule 8(b), the defendants must be tried separately.  See United States v. Bledsoe, 674 F.2d 647, 657 (8th Cir.1982) (vacating conviction because of misjoinder and remanding for new trial).

It is the well-settled rule in this circuit that when all of the defendants charged in an indictment are part of a single common conspiracy joinder under Rule 8(b) is proper. U.S. v. Mendoza, 876 F.2d 639, 643 (8th Cir.1989).  Having found the presence of a single conspiracy in which Dolinsky participated with Anderson and Bedard-Anderson, the Court finds the joinder of the three defendants in this case appropriate.

2.    Permissive Severance under Rule 14(a)

Dolinsky alternatively argues that severance in this case should be permitted under Rule 14(a) because Dolinsky is in danger of conviction solely on the basis of "guilt by association." Dolinsky further argues that he faces significant "spillover" effects from evidence the Government will present to prove a pattern of conduct by Anderson and Bedard-Anderson that will then be used to convict Dolinsky on a single sale of Zomax stock.  Finally, Dolinsky contends there are substantial items of evidence that would be inadmissible in his own separate trial, namely, evidence regarding the formation of the Trust and the collective sale of 800,000 shares of Zomax stock by Anderson and Bedard-Anderson.  Dolinsky argues

---

[3]  Like Anderson, Dolinsky also suggests application of the "wheel/spokes/rim" suggested in Kotteakos v. United States, 328 U.S. 750 (1946), as well as United States v. Ellis, 709 F.2d 688 (11th Cir.1983).  In the context of a motion for severance under Rule 8(b), the Eighth Circuit has specifically rejected the application of this test stating that Rule 8(b) does not require there to be a "common rim around a wheel" in order to have multiple defendants participate under Rule 8(b).  Haggard, 369 F.2d at 973 n.12.

that a joint trial under these circumstances would create undue prejudice to his right to a fair trial.

Federal Rule of Criminal Procedure 14(a) provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever defendants' trials, or provide any other relief that justice requires." Thus, even when Rule 8(b) permits joinder, the court may sever certain defendants' cases from others 'to protect the defendants' fair trial rights. Delpit, 94 F.3d 1143.

Where multiple defendants are charged in the same indictment, there is a preference for a joint trial unless the party moving to sever can show that the benefits are outweighed by a clear likelihood of prejudice. See Zafiro v. United States, 506 U.S. 534, 537 (1993); United States v. Frazier, 280 F.3d 835, 844 (8th Cir. 2002). "A district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Zafiro, 506 U.S. at 539.

Under these principles, the Court does not find severance to be warranted in this case. As noted above, the Indictment sufficiently alleges Dolinsky's involvement in a conspiracy to trade in Zomax common stock based upon material, non-public information possessed by Anderson and Bedard-Anderson. In addition, the conspiracy allegations include mail fraud and money laundering, making the evidence relating to the substantive charges of mail fraud and money laundering related to evidence of the alleged conspiracy. The Indictment specifically alleges that the money used in the money laundering transactions was directly and criminally derived from conspiracy to defraud Zomax and its shareholders by trading in Zomax stock on material, non-public information in which all three of the defendants are alleged to have participated.

Moreover, even though Dolinsky is not named in all of the substantive charges with his co-

conspirators, severance is not required merely because evidence which is admissible only against some defendants may be damaging to others. <u>Id.</u> The Supreme Court has made it clear that the risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions. <u>Id.</u> at 1144 (citing <u>Zafiro</u>, 506 U.S. at 540-41). In the words of the Eighth Circuit

> [i]n re-affirming the laws preference for joint-trials, we do not endorse guilt by association. Instead, we presume, as we must, that juries can and do follow instructions conscientiously, evaluate evidence carefully, and judge defendants individually.

<u>Delpit</u>, 94 F.3d at 1144.

The Court finds the allegations in this case to be sufficiently interrelated, and that severance under Rule 14(a) is not necessary to protect Dolinsky from undue prejudice. The Court additionally concludes that a joint trial in this case will promote efficiency and serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts. For all of these reasons, the Court recommends that Dolinsky's Motion to Sever, joined by Anderson and Bedard-Anderson, be denied in its entirety.

### C.    Motion to Dismiss Count 1-7, 25-30 and Forfeiture Allegations Based Upon Unconstitutionality of 18 U.S.C. § 1346

Defendant James Anderson seeks dismissal of Counts 1-7, 25-30 and the forfeiture allegations in the Indictment contending that these Counts rely upon an unconstitutionally vague statute, 18 U.S.C. § 1346. The Court previously granted Bedard-Anderson and Dolinsky permission to join in Anderson's motion.

Section 1346 provides: "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §

1346.  In 1988, Congress enacted section 1346 to overrule McNally v. United States, 483 U.S. 350, 358 (1987).  In McNally, the Supreme Court reversed a substantial body of precedent previously developed by the federal circuits by holding that the mail fraud statute protected only property rights and did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." Id. at 358; see also Carpenter v. United States, 484 U.S. 19, 25(1987) (although, under McNally, the mail fraud statute does not protect intangible right to honest and faithful service, the statute does protect intangible property rights).  The McNally Court based its holding upon the wording of the mail fraud statute, explaining that the phrase "any scheme or artifice to defraud" was insufficiently clear and definite to justify construing the act so broadly that it would protect an intangible right to honest services. See McNally, 483 U.S. at 358-60.  Emphasizing that it merely was applying principles of statutory interpretation, the McNally Court declared, "[i]f Congress desires to go further, it must speak more clearly than it has." Id. at 360.  Congress quickly responded by passing section 1346 a year later.

Anderson claims § 1346 is unconstitutionally vague on its face, and as applied to the private sector fraud allegations charged in the Indictment.  Anderson contends the terms "intangible rights" and "honest services" are undefined in the United States Code, and that the existing case law addressing this statute offers only confusing and dissimilar definitions.  Anderson argues the statute fails to provide adequate notice of prohibited conduct, and that section 1346 is, therefore, a standardless criminal theory that forces courts to create common law crimes, and leaves those charged with its enforcement without guidelines, which results in discriminatory enforcement.  Anderson seeks dismissal of all charges in the Indictment that rely upon section 1346 because it is unconstitutional on its face and as applied to the charged conduct in this

case.

Vagueness

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 357 (1983). A criminal statute is vague if persons of a common intelligence must necessarily guess at its meaning and differ as to its application. U.S. v. Carpenter, 422 F.3d 738, 746 (8th Cir.2005) (citing United States v. Smith, 171 F.3d 617, 622-23 (8th Cir.1999). Because we assume that a person "is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that they may act accordingly. Vague laws may trap the innocent by not providing fair warning." U.S. v. Posters 'N' Things, Ltd., 969 F.2d 652, 659 (8th Cir.1992) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). In addition, "arbitrary and discriminatory enforcement is to be prevented, [and] laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 108-109.

A statute is not, however, required to specify every prohibited act. "Statutes need not achieve meticulous specificity and may instead embody flexibility and reasonable breadth." Id. at 110. "Limitations inherent in the English language often prevent drafting of statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." Arnet v. Kennedy, 416 U.S. 134, 159 (1974).

Facial Challenge

Anderson contends section 1346 is unconstitutionally vague on its face. It is well-settled in the Eighth Circuit that facial vagueness challenges to statutes that do not implicate First Amendment rights are evaluated based on the particular facts of the case. See e.g., Nooner v. Norris, 402 F.3d 801, 807 (8th Cir.2005); Planned Parenthood of Minnesota v. State of Minnesota, 910 F.2d 479, 482 (8th Cir. 1990); see also Maynard v. Cartwright, 486 U.S. 356, 361 (1988) ("Vagueness challenges not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as applied basis."). A criminal statute in this context is not vague on its face unless it is "impermissibly vague in all of its applications." Doe v. Miller, 405 F.3d 700, 708 (8th Cir.2005) (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, (1982); see also Rust v. Sullivan, 500 U.S. 173 (1991) (If a federal statute can constitutionally be applied to a particular defendant's case, a court is obliged to construe the law to cover at least that circumstance).

Section 1346 does not implicate Anderson's constitutional rights. The conduct to which the mail fraud statutes are directed is deceitful schemes aimed at a victim's property or at his intangible right to honest services. See Rybicki, 354 F.3d at 149 (Raggi, J., concurring). "The Constitution of the United States does not secure to any one the privilege of defrauding the public." Id. (citing Plumley v. Massachusetts, 155 U.S. 461, 479 (1894)). Although Anderson invites the Court to undertake a facial analysis of § 1346 by employing a standard that is less stringent than the "impermissibly vague in all its applications" standard, and points the Court to City of Chicago v. Morales, 527 U.S. 41 (1999) for guidance, the Court declines this invitation. Under the Eighth Circuit precedent cited above, the Court's analysis of Anderson's facial challenge to a statute that has no constitutional implications is to be conducted

23

through an as-applied analysis.

### As-Applied Challenge

Defendants may only succeed in an as-applied vagueness challenge by demonstrating that § 1346 is impermissibly vague in all its applications. Woodis v. Westark Community College, 160 F.3d 435, 439 (8th Cir.1998) (citing Hoffman Estates, 455 U.S. at 495). In other words, a court must evaluate the challenged statute in light of the specific facts of the case at hand. U.S. v. Washam, 312 F.3d 926, 929 (8th Cir.2002).

While the Eighth Circuit has yet to confront a direct challenge to the constitutionality of § 1346 on vagueness grounds,[4] numerous other courts that have considered the question have rejected vagueness challenges to the application of § 1346 to "honest services" fraud. See, e.g., Rybicki, 354 F.3d 124 (rejecting vagueness challenge by attorneys who arranged for secret gratuities to be paid to claims adjusters

---

[4]In arguing the unconstitutionality of §1346, Anderson directs the Court to a footnote written by Chief Judge Loken in the Eighth Circuit case United States v. Lamoreaux, 422 F.3d 750 n3 (8th Cir.2005). Lamoreaux is a private sector "honest services" case in which the defendant, the president of a private corporation, received kickbacks from the corporation's customers for negotiating service contracts between the customers and the corporation. Chief Judge Loken, writing for the Eighth Circuit, affirmed the defendant's conviction for mail fraud, finding §1346 applied to "schemes to violate a private sector fiduciary's duty to provide honest services to his clients." Id. at 754. (cont....)

As part of the Court's analysis, the Court examined the type of proof that is necessary to show criminal fraud in the context of private business honest services cases, ultimately concluding that "absent proof of actual financial harm, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent." (citing United States v. Jain, 93 F.3d 436, 442 (8th Cir.1996)). At the close of the discussion, Chief Judge Loken noted the following in footnote three: " [i]ndeed, some have argued that the disagreement among the circuits over critical issues such as whether actual harm must be proved demonstrates that 18 U.S.C. § 1346 is so vague as to be facially unconstitutional." The Court finds that this footnote had no bearing upon the determination made by the Lamoreaux Court. Indeed, the constitutionality of §1346 was not raised in Lamoreaux, nor does Chief Judge Loken specifically state that in his opinion §1346 is unconstitutional. Accordingly, this Court finds footnote three to be non-binding dicta.

employed by insurance companies against whom the defendants' clients asserted claims); <u>United States</u> <u>v. Frega</u>, 179 F.3d 793, 798, 803 (9thCir.1999) (rejecting a vagueness challenge by an attorney convicted under § 1346 for bribing a state court judge); <u>United States v. Frost</u>, 125 F.3d 346, at 352, 370-71 (6th Cir.1997) (a university professor who helped students to obtain degrees by fraud in exchange for their influence in obtaining government contracts); <u>United States v. Gray</u>, 96 F.3d 769, 772, 776-77 (5th Cir.1996) (basketball coaches who helped students obtain academic eligibility by fraud); <u>United States v.</u> <u>Castro</u>, 89 F.3d 1443, 1447-48, 1455 (11th Cir.1996) (attorneys who paid kickbacks to state court judges to obtain appointments as public defenders); <u>United States v. Bohonus</u>, 628 F.2d 1167, 1173 (9th Cir.1980) (insurance manager who received payments through the mail in accordance with a kickback scheme with the intent to defraud his employer).

Moreover, other courts have recognized the viability of "intangible rights" fraud when a private defendant stands in a fiduciary or trust relationship with the victim of the fraud. For example, in <u>Frost</u>, 125 F.3d at 366, the Sixth Circuit held that "private individuals, such as [the defendants who were university professors], may commit fraud by breaching a fiduciary duty and thereby depriving the person to which the duty is owed of the intangible right to the honest services of that individual." <u>See</u> <u>also</u> <u>e.g.,</u> <u>Rybicki</u>, 354 F.3d at 127 (§ 1346 scheme includes a "scheme or artifice to use the mails or wires to enable an officer or employee of a private entity ... purporting to act for and in the interest of his or her employer ... secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person"); <u>United States v. Devegter</u>, 198 F.3d 1324, 1330 (11th Cir.1999) (holding that § 1346 applies to private sector defendants but that such cases must involve a breach of fiduciary duty and reasonably foreseeable economic harm).

In analyzing the constitutional viability of § 1346 as it applies to the facts of this case, the Court finds the thorough and well-reasoned opinion of the Second Circuit in Rybicki to be instructive. 354 F.3d 124. In Rybicki, the defendants were several attorneys who arranged for secret gratuities to be paid to claims adjusters employed by insurance companies against whom the defendants' clients asserted claims. In analyzing defendants' vague-as-applied challenge to section 1346, the Court undertook an extensive review of the history of "honest services" and mail fraud both before and after the McNally decision, and Congress' enactment of section 1346 to overrule McNally. Id. at 132-145. The Rybicki Court concluded that "[u]ntil 1987, federal courts read both the mail and wire fraud statutes to criminalize not only schemes for obtaining money or property, but also schemes to deprive another of the intangible right of honest services." Id. at 133. (internal quotations and citation omitted).

Finding Congress' purpose in enacting § 1346 to be the reinstatement of the pre-McNally "intangible rights" doctrine, the Rybicki court turned its attention to the question of constitutional vagueness. In order to determine whether there was a "well-settled meaning" of "scheme or artifice to deprive another of the intangible right of honest services" at the time § 1346 was enacted, the Court looked to pre-McNally "honest services" cases. Id. at 134-137.

Beginning with the private sector honest services cases cataloged by Justice Stevens in his dissent in McNally, 483 U.S. at 363-34 nn. 3 & 4, the Rybicki Court conducted an extensive review of these and other additionally identified cases. Rybicki, 354 F.3d at 139 n13. This review included the Eighth Circuit case of United States v. McCracken, 581 F.2d 719 (8th Cir.1978). The Court generally categorized the pre-McNally private sector honest services cases into two categories: (1) those cases involving bribes or kickbacks, and (2) those involving self-dealing. Id. at 139-40. McCracken was categorized as a pre-

<u>McNally</u> case recognizing an intangible right to honest services in a self-dealing case. <u>Id.</u> at 140.

From its review and analysis of these pre-<u>McNally</u> private sector honest services cases, the <u>Rybicki</u> court determined that the term "scheme or artifice to deprive another of the intangible right to honest services" in section 1346, when applied to private actors, means

> a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for an in the interests of his or her employer (or of the person to whom the duty is owed) secretly to act in his or her or the defendant's own interest instead, accompanied by a material misrepresentation or omission of information disclosed to the employer or other person.

<u>Id.</u> at 141-142. The Court further noted that in self-dealing cases, unlike bribery or kickback cases, there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment. <u>Id.</u> at 141.

Having found that the phrase "scheme or artifice to deprive another of the intangible right of honest services" has the meaning it had in the pre-<u>McNally</u> case law, the <u>Rybicki</u> Court concluded the potential reach of section 1346 was not virtually limitless as the defendants had argued. The Court found it unbelievable that the defendants "did not know that they were courting prosecution and conviction for mail and wire fraud when they undertook the use of the wires and mails, in effect to pay off insurance adjustors, while assiduously covering their tracks." <u>Id</u> at 142.

The <u>Rybicki</u> Court thus concluded that the statute, as applied to the defendants' intentionally fraudulent behavior, defined the criminal offense with sufficient definiteness that ordinary people, such as the defendants, can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. <u>Id.</u> The Court further concluded from its analysis that § 1346

27

"will channel the discretion of prosecution" and "it will provide [] explicit standards to those who apply it." Id. at 143 (internal citations omitted). Further noting that no Circuit court has ever held that section 1346 is unconstitutionally vague, the Rybicki Court held that section 1346 as *applied to the facts of the case* before it was not unconstitutionally vague. Id. (emphasis in original).

The Court's exhaustive analysis in Rybicki significantly informs this Court's consideration of the defendants' as-applied challenge in this case. First, without specifically undertaking an in-depth analysis of the history of the honest service doctrine similar to Rybicki, the Eighth Circuit has indicated that section 1346 "was enacted ... to overrule the Supreme Court's decision in McNally ," and that it "restored the vitality of our pre-McNally cases involving official corruption." U.S. v. Blumeyer, 114 F.3d 758, 765 (8th Cir.1997) (citing United States v. Jain, 93 F.3d 436, 441-42 (8th Cir.1996) cert. denied 520 U.S 1273.

Pre-McNally intangible rights cases from the Eighth Circuit are consistent with the findings of the Rybicki Court, and demonstrate the existence of a well-established meaning of "scheme or artifice to deprive another of the intangible right of honest services" at the time § 1346 was enacted by Congress. In United States v. McCracken, a case cited in the Rybicki opinion, managers of a private farm-owned cooperative created separate companies as part of a scheme to defraud the cooperative by diverting shipments of fertilizer from the cooperative through their own companies to their own customer whereby their own companies profited rather than the cooperative. 581 F.2d 719, 721 (8th Cir.1978). The defendants never informed the cooperative's Board of Directors of this scheme or of their conflict of interest in their separately owned companies. Upholding the defendants' convictions for mail fraud and conspiracy to commit mail fraud, the Eighth Circuit stated

[w]e agree with the government that the proof was overwhelming that [the defendant] knowingly

used his fiduciary position in [the cooperative] to create gain for his own companies.  (Citation omitted)  The overall evidence also sufficiently demonstrates the use of the mails was an integral part of the scheme.

Id. at 723; see also U.S. v. Pintar, 630 F.2d 1270, 1279 (8th Cir.1980) ("Schemes to defraud may include schemes to deprive the government and citizens of tangible items such as funds or of intangibles such as the loyal, honest and faithful services of employees"); United States v. States, 488 F.2d 761, 764-66 (8th Cir.1973) cert. denied, 417 U.S. 909, 950 (1974) ("It is now well established in this Circuit that proof of a violation of 18 U.S.C. § 1341 does not require evidence that a deceptive scheme was intended to defraud individuals of money or other tangible property interests.  A deceptive scheme will be held violative of 18 U.S.C. § 1341 if it is shown to operate to deprive individuals of significant intangible rights or interests").

In addition, in its more recent cases, the Eighth Circuit has stated that while most "intangible rights mail fraud cases have involved corrupt public officials, we have held that the plain language of § 1346 applies as well to schemes to violate a private sector fiduciary's duty to provide honest services to his clients." Lamoreaux, 422 F.3d at 754 (citing United States v. Pennington, 168 F.3d 1060, 1064 (8th Cir.1999)); see also Jain, 93 F.3d at 441 ("It is certainly true that the literal language of § 1346 extends to private sector schemes to defraud another of the right to honest services").

Turning to the facts of this case, the Court finds that 18 U.S.C. § 1346 provides a person of ordinary intelligence a reasonable opportunity to know that the conduct involving the breaching of fiduciary duties by engaging in the trading of a company's stock on the basis of material, non-public information deprives the company and its shareholders of the honest services of the one who owes the fiduciary duties. Anderson and Bedard-Anderson held positions of trust as executives of Zomax, and a relationship of trust

and confidence existed between the shareholders of the corporation and its corporate executives that

obtained confidential information by reason of their position in that corporation.  United States v. O'Hagen,

521 U.S. 642, 652 (1997) (citing Chiarella v. United States, 445 U.S. 222, 228 (1980)).  That relationship

"gives rise to a duty to disclose [or abstain from trading] because of the necessity of preventing the

corporate insider from taking unfair advantage of ... uninformed stockholders."  Id. (citing at Chiarella 228-

229).

    The alleged conduct in this case involves the sharing of material, non-public financial information

and trading in the company's stock based upon that shared information.  If proved, this would be a clear

violation of the position of trust, and strongly suggests the presence of fraud and deception.  This is

especially true when one alleged source of the material, non-public financial information is the Chairman

and CEO of the company aided by a corporate vice-president.  Moreover, it is alleged that an experienced

investment manager of ordinary intelligence would know that soliciting the Chairman and CEO of a

publically traded corporation for advice regarding the purchase of the company's stock would be a

violation of the law.  If Anderson, Bedard-Anderson and Dolinsky then proceeded to trade in Zomax stock

based upon this information, as alleged in this case, such conduct would only further shatter the relationship

of trust and confidence Zomax and its shareholders placed in the company's executives.  In short, assuming

the Government can meet its burden of proof, Zomax and its shareholders would have been deprived of

their intangible rights to Anderson's and Anderson-Bedard's honest services in a manner that is within the

established meaning of §1346.

    In sum, the Court finds that the phrase "intangible rights to honest services" is not unconstitutionally

vague when applied to the facts of this case.  The terms and concepts represented in this phrase have been

considered and applied in both the public and private sectors by the courts of this and other circuits for decades, with the exception of a brief hiatus under the short-lived ruling handed down in <u>McNally</u>. The Court finds that 18 U.S.C. § 1346 provides a person of ordinary intelligence a reasonable opportunity to know that the conduct alleged in this case deprives Zomax and its shareholders of the honest services of Anderson and Bedard-Anderson. For these same reasons, the Court finds that section 1346 together with section 1341, one of the sections which 1346 exists to define, provides sufficient standards for those who seek to apply the statute, at least in the context of private sector insider-trading circumstances present in this case. Accordingly, the Court finds § 1346, as applied, is not unconstitutionally vague, and recommends Anderson's Motion to Dismiss, joined by Bedard-Anderson and Dolinsky, be denied.

### D.      Motion to Bifurcate

Defendant Anderson moves this Court for an order bifurcating the guilt phase of the proceedings from the proceeding regarding forfeiture. Anderson argues a unitary proceeding would compromise his right to remain silent during the guilt portion but to testify regarding forfeiture. Anderson further asserts a unitary proceeding invites jury confusion regarding whether to apply the preponderance of the evidence standard applicable to forfeiture, or whether to apply a reasonable doubt test applicable to questions of guilt. The Court previously granted Bedard-Anderson and Dolinsky permission to join in Anderson's motion. The Government does not oppose the motion.

This Court agrees that a bifurcated proceeding is appropriate. Accordingly, the Court recommends Anderson's motion to bifurcate, joined by Bedard-Anderson and Dolinsky, be granted.

### E.      Motion to Dismiss Statements

Defendant Dolinsky moves this Court to suppress all statements made by him to government

31

agents and evidence derived therefrom.  Dolinsky contends any such statements were obtained in violation of his rights under the Fifth Amendment of the United States Constitution.

The Government indicates that Dolinsky was interviewed by lawyers from the Enforcement Division of the Securities and Exchange Commission on May 1, 2003.  The Government states that Mr. Dolinsky asserted his Fifth Amendment privilege with respect to each and every substantive question he was asked by the SEC attorney.  The Government acknowledges that it cannot comment at trial on Dolinsky's assertion of his right to remain silent, and represents that there were no other statements made by Dolinsky to government agents.

Based upon these representations by the Government, the Court recommends Dolinsky's motion to suppress statements be denied as moot.

### F.    Motion to Suppress Physical Evidence

Defendant Dolinsky filed a motion to suppress the following physical evidence: (1) items seized at the time of his arrest; (2) items seized pursuant to the execution of any search warrant; (3) confessions or statements; (4) evidence related to identification of the defendant based on photographic display; and (5) all evidence seized as the result of illegal seizures.

The Government states Dolinsky's motion seeks to suppress a range of evidence that is not present in this case, and that no evidence of the kinds detailed in the motion exists.  Accordingly, and based upon the Government's representations, the Court recommends Dolinsky's motion be denied as moot.

## IV.   CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.      Defendant Anderson's Motion to Dismiss Count 1 for Duplicity (Doc. No. 57), to

which Defendants Bedard-Anderson and Dolinsky have joined, be **DENIED.**

**However**, for the reasons stated herein, the Court **recommends that the**

**Government be ordered to provide the defendants with a bill of particulars** that

identifies with specificity each of the twenty-seven stock trades referenced in Paragraph

10.b., and each of the twenty-seven stock trades referenced in Paragraph 10.f.  For

completeness, the bill of particulars should also include the identification of the date,

time, caller and recipient for each of the telephone calls referenced in Paragraph 10.i.

2.      Defendant Dolinsky's Motion to Sever for Misjoinder of Defendants (Doc. No. 32),

to which Defendants Anderson and Bedard-Anderson have joined, be **DENIED.**

3.      Defendant Anderson's Motion to Dismiss Counts 1 through 7 and 25 through 30 and

Forfeiture Allegations for Unconstitutionality as Applied and Facial Unconstitutionality

(Doc. No. 59), to which Defendants Bedard-Anderson and Dolinsky have joined, be

**DENIED.**

4.      Defendant Anderson's Motion to Bifurcate (Doc. No. 63), to which Defendants

Bedard-Anderson and Dolinsky have joined, be **GRANTED.**

5.      Defendant Dolinsky's Motion to Suppress Statements (Doc. No. 28) be **DENIED AS**

**MOOT.**

6.      Defendant Dolinsky's Motion to Suppress Physical Evidence (Doc. No. 29) be

**DENIED AS MOOT.**

33

7.      The Court reiterates its previous finding, set forth in its Order dated March 1, 2006,

that Defendant Anderson's Motion to Strike Allegations and Exclude Evidence

Regarding Zomax Corporate Policies (Doc. No. 61), to which Defendants Bedard-

Anderson and Dolinsky have joined, is referred to the trial judge in this matter, and that

Defendant Dolinsky's Motion for Early Disclosure of Rule 1006 Exhibits and All

Evidence Upon Which Those Exhibits are Based (Doc. No. 25) is referred to the trial

judge in this matter.

Dated: April 6, 2006                               s/Jeanne J. Graham

                                        _____
                                        JEANNE J. GRAHAM
                                        United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by April 25, 2006.  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  A District Judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.